[No. C053173. Third Dist. Apr. 15, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ADAM JACKSON BRAGG, Defendant and Appellant.

**COUNSEL**

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, J. Robert Jibson and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

HULL, J.—A jury convicted Adam Jackson Bragg of the attempted murders (Pen. Code, §§ 664, 187, subd. (a); undesignated section references that follow are to the Pen. Code) of W.V., S.P., and R.S. As to the attempted murders of W.V. and S.P., the jury found that during the commission of those offenses, defendant intentionally and personally discharged a firearm resulting

in great bodily injury (§ 12022.53, subd. (d)), that he intentionally and personally discharged a firearm (§ 12022.53, subd. (c)), and that he committed the offense for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)). As to the attempted murder of R.S., the jury made the same findings except that it did not find that defendant intentionally and personally discharged a firearm resulting in great bodily injury (§ 12022.53, subd. (d)).

The jury also convicted defendant of possession of a firearm by a felon (§ 12021, subd. (a)(1)).

Sentenced to a term of life imprisonment with a minimum term of 50 years to be served consecutive to an aggregate determinate term of 35 years, defendant appeals. He claims (1) the trial court erred in its instructions to the jury on the concurrent intent ("kill zone") theory of liability for the attempted murders of S.P. and R.S.; (2) the trial court erred by failing to instruct the jury on the offense of assault with a firearm as a lesser included offense of attempted murder committed by the intentional and personal discharge of a firearm; (3) the trial court erred by giving the jury an instruction relating to the street gang enhancement that allowed the jury to find the enhancement true "without determining whether the prosecution had proved the 'pattern of criminal gang activity' element of a criminal street gang"; and (4) the enhancements added to the sentences for the attempted murders of S.P. and R.S. should have been stayed pursuant to section 654.

We affirm the judgment.

## FACTS

About 9:00 p.m. on March 27, 2005, W.V., L.V., M.O., and a man named Joey drove to Hites Market located on Fruitridge Road in Sacramento. They were joined, in a second car, by S.P. and her two children and H.J.

Hites Market and the immediately surrounding area is one frequented by the street gang known as "Bloods," and W.V. was, at one time, associated with the "Fruitridge Bloods."

When W.V. and the others arrived at Hites Market, defendant and others were standing outside the market's door. R.S. was already at the market trying to buy some beer. R.S. spoke to defendant at one point when R.S. found he did not have enough money for the beer R.S. wanted to buy.

Because W.V. and defendant grew up together and W.V. had not seen defendant for awhile, he walked up to defendant, gave him a hug and said "What's up, dog?" or words to that effect.

Defendant responded to W.V.'s greeting by saying "What's up?" and W.V. replied, "Nothing, just kicking back being boo." Defendant then said, "I'm a Crip, cuz" and W.V. replied, "Fuck you, then" and walked into the store.

When W.V. said, "Nothing, just kicking back being boo," he thought defendant was a Blood because defendant was at the store in Blood territory and had grown up in the neighborhood.

W.V.'s statement—"Nothing, just kicking back being boo"—when addressed to a member of the Crips would be taken as an insult and a challenge. Bloods change words beginning with a "c" to a word beginning with a "b" and Crips replace "b's" with "c's." A Blood saying he was kicking back being "boo" would be an appropriate greeting from one Blood to another, but an affront to a Crip because it addresses a rival gang member with a Blood greeting. It is especially insulting if done, as here, in public.

As W.V. went into Hites Market, defendant began yelling at W.V. telling him to "bring [his] bitch ass outside" or saying "bitch ass nigger, come outside the store." At this point, W.V. started out of the store thinking only that he and defendant were going to engage in a fist fight. W.V. did not think there would be greater violence because defendant and W.V. had grown up together, defendant lived just around the corner from the store and, at some point, W.V. had trimmed defendant's mother's trees.

Some of the women who had come to the market with W.V. began pleading with W.V. not to fight and began trying to hold him back or block his exit as he went back through the door of the market. At or about the point that W.V. and the women passed through the doorway, defendant, standing outside and facing them, took a gun out of his pocket and began firing it in their direction. Upon seeing the gun, or hearing the gunshots, W.V. and the others ran back into the store.

The prosecutor asked S.P. what she saw defendant do when S.P. went through the door. She said: "[Defendant] pulled a gun out and he started firing it at us—at my brother as far as us in the crowd because it was like a crowd of people right there and he just started firing the gun at basically, of course, in the crowd." She added: "[Defendant] like continued to shoot as we all ran into the store a few more times, maybe like two because that's when I had got hit in the leg."

Defendant fired seven times shooting W.V. twice in the buttocks. Defendant shot S.P. in the right lower leg and shot R.S. in the ankle.

Detective Brandon Luke, an expert on the subject of criminal street gangs, testified that the Crips are a street gang that originated in Los Angeles. Its

members involve themselves in murders, robberies, rapes, narcotic sales, drug trafficking, home invasions, shooting into occupied vehicles, shooting into occupied homes, and witness intimidation.

According to Luke, law enforcement agencies "validate" a person as a member of the Crips by considering such factors as self-admission of gang membership, the presence of gang tattoos on a person's body, active participation in gang-related crimes, acknowledgement of membership by other gang members, an appearance in gang-related photos, contact with police at gang-related activities, the receipt of correspondence while in jail indicating gang membership, and other factors.

Luke testified that defendant was validated as a Crip in 1991, specifically a Cuny Avenue Crip. He has tattoos that identify him as a 49th Street Cuny "Hustla" Crip on his forearm and on the back upper portion of each of his arms.

Luke explained that gang members gain respect by committing violent crimes and gain more respect when they commit crimes against rival gang members.

In Luke's opinion, defendant's actions at Hites Market were a benefit to the Crips gang because he was a Crip with a gun who came out on top in the other gang's territory. His actions helped instill fear of the gang in the other gang and fear of the gang in the community, especially since defendant committed the crimes "right out in the open."

Luke testified to two predicate offenses to establish the basis for the criminal street gang sentence enhancement alleged pursuant to section 186.22, subdivision (b)(1).

First, on March 28, 2004, Crips gang members were at a party on G Parkway in Sacramento which was an area controlled in part by the 29th Street Crips. One of the guests at the party was asked where he was from and he replied "Meadowview." The person asking the question believed the guest meant he was a member of the Meadowview Bloods as opposed to the neighborhood of Meadowview, and informed Mtula Payton, a validated member of the 29th Street Crips, of the guest's response. Payton approached the guest, told him he was not welcome and hit him in the face, knocking him unconscious. Others jumped on and beat the guest, who suffered a broken jaw on two sides and a broken orbital eye socket. The assault was to the benefit of the Crips because it demonstrated to the younger members how they were supposed to act and tended to instill fear of the gang in others.

Regarding a second offense, Arthur Johnson, a validated North Highlands Gangster Crip was convicted on January 26, 2005, of attempted murder with

a gang enhancement after he shot a man unaligned with any gang three times for breaking up a fight in which a Crip had been involved. This act was of benefit to the Crips because the crime, committed in the open, taught others that they should not involve themselves in Crips gang activity and that there would be repercussions if they did so.

The prosecution and defendant stipulated that, on or about May 1, 1998, defendant was convicted of the crime of possession for sale of cocaine base in violation of Health and Safety Code section 11351.5, a felony.

Discussion

I

*Concurrent Intent*

As set forth earlier, defendant first contends that the court's instructions to the jury regarding the concept of concurrent intent were erroneous. He argues that the instructions allowed the jury to find defendant guilty of the attempted murders of S.P. and R.S. without finding that defendant acted with the necessary intent.

In *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*), our high court established the rule in California that, to be guilty of attempted murder, a defendant must intend to kill the victim of the attempt and not some other person. In discussing the necessary intent to kill when the charge is attempted murder, the court explained: "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

But the intent to kill necessary to a charge of attempted murder of a victim other than the primary victim may, in an appropriate case, be established by proving that defendant acted with "concurrent" intent as to the other victim. *Bland* explained that "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.' " (*Bland, supra*, 28 Cal.4th at p. 329.) Citing and quoting *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984], our Supreme Court said: " 'The intent is concurrent . . . when the nature and

scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.' " (*Bland, supra,* at p. 329.) This "kill zone" concept applies when, for instance, someone puts a bomb on an aircraft intended to kill one of the many passengers on the airplane or fires on a crowd in a manner devastating enough to kill everyone in the group that includes the primary victim. If the defendant is unsuccessful in killing his primary target, he is deemed to have concurrently intended to kill the others and may be found guilty of the attempted murder of everyone in the "kill zone." (*Id.* at pp. 329–330.)

In this matter, the prosecution relied on the doctrine of concurrent intent in proving defendant was guilty of the attempted murders of S.P. and R.S.

Regarding the two counts alleging those attempted murders, the trial court instructed the jury in part using Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 600. The court instructed the jury that:

"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or kill zone.

"In order to convict the defendant of the attempted murder of [S.P.] and [R.S.], the People must prove that the defendant not only intended to kill [W.V.] but also either intended to kill [S.P.] and [R.S.], or intended to kill anyone within the kill zone.

"If you have a reasonable doubt whether the defendant intended to kill [S.P.] and [R.S.] or intended to kill [W.V.]—by harming anyone in the kill zone, you must find the defendant not guilty of the attempted murder of [S.P.] and [R.S.]."

After the jury began its deliberations, it requested further instruction from the court on the "kill zone" theory of culpability. The jury asked: "Is there more info. you can provide on the 'kill zone': 1) the legal definition[;] 2. any other info to help us understand the concept?"

The court, with the agreement of counsel, responded to the jury's inquiry by quoting from *Bland,* further instructing the jury that: "The fact a person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial

airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the fact finder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the fact finder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone."

Defendant argues it was error to give these instructions because they allowed the jury to find defendant guilty of the attempted murders of S.P. and R.S. "without finding that he acted with the necessary intent." Specifically, he argues that the instructions are "erroneous because [they] allow[] the jury to find a defendant guilty of attempted murder on a theory of concurrent intent, merely by finding that the defendant intended to *harm*, rather than kill, those in the zone of danger around the intended victim" thereby lessening the prosecution's burden of proof.

The People respond by pointing out that other portions of the instructions regarding the attempted murders of S.P. and R.S. make it plain that, in order to be guilty of their attempted murder, defendant had to have the intent to kill, and not just harm, each of those victims. We agree with the People.

As set forth above, the jury was instructed that, in order to convict defendant of the attempted murders of S.P. and R.S., it had to find that defendant harbored an *intent to kill* each of them individually. The trial court instructed the jury that the crime required that defendant had to have taken a direct but ineffective step toward *killing* another person. The trial judge also told the jury that "[a] person may *intend to kill* a specific victim or victims and at the same time *intend to kill* anyone in a particular zone of harm or 'kill zone.' " (Italics added.)

■ "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from

a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251]; see *People v. Ledesma* (2006) 39 Cal.4th 641, 718 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

"We credit jurors with intelligence and common sense (see *People v. Venegas* (1998) 18 Cal.4th 47, 80 [74 Cal.Rptr.2d 262, 954 P.2d 525]) and do not assume that these virtues will abandon them when presented with a court's instructions. (See also *People v. Arias* (1996) 13 Cal.4th 92, 142 [51 Cal.Rptr.2d 770, 913 P.2d 980] [reasonable jury would understand instruction as meaning consciousness of some wrongdoing, not of every element of offense]; *People v. Cain* (1995) 10 Cal.4th 1, 33–34 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)" (*People v. Coddington* (2000) 23 Cal.4th 529, 594 [97 Cal.Rptr.2d 528, 2 P.3d 1081].)

We ask whether a "reasonable juror would apply the instruction in the manner suggested by defendant." (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1493 [46 Cal.Rptr.2d 645].)

No reasonable juror could have failed to understand from the instructions as a whole that, to the extent the court occasionally used the word "harm" or the phrase "zone of harm," the harm to which the court referred was the ultimate harm of death and that the law required that defendant had to have intended to kill the victims. Given the totality of the instructions, there was no error.

Defendant argues further instructional error in the court's additional instructions to the jury given in response to the jury's question about the concept of a "kill zone." Specifically, he focuses on that part of the court's additional instructions that told the jury that "the intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." He argues that the words "we can conclude" imply that the court, the law, or others would make such a determination even though, in the law, that determination is left exclusively to the jury. Defendant does not elaborate on this point and the People do not respond to it.

 As to this argument, we first note that we consider only those arguments sufficiently developed to be cognizable. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [34 Cal.Rptr.2d 558, 882 P.2d 249].) "To the extent

defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*Ibid.*) On this ground alone, we may reject this contention.

In any event, considering the instructions as a whole, no reasonable juror would conclude from them that the decision as to defendant's guilt of the attempted murder charges in this matter lay anywhere but with this jury. There was no error.

## II

### *Assault with a Firearm as a Lesser Included Offense of Attempted Murder*

Defendant argues that the trial court committed reversible error by failing to instruct the jury on assault with a firearm as a lesser included offense of the crime of attempted murder. He bases his argument on the thought that, since the attempted murder allegations carried with them a sentence enhancement for intentionally and personally discharging a firearm, the attempted murders could not have been committed without also committing the crime of assault with a firearm, thus making the latter a lesser included offense of the former.

Counts one, two and three charged defendant with the attempted murders, respectively, of W.V., S.P., and R.S. Each of the three attempted murder counts alleged that defendant did unlawfully and with malice aforethought attempt to murder each of the three victims. As to each of those counts, the information also alleged a sentence enhancement based on defendant's use and intentional discharge of a firearm in violation of section 12022.53.

"Two tests have traditionally been applied in determining whether an uncharged offense is necessarily included within a charged offense—the statutory or legal 'elements' test and the 'accusatory pleading' test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former. [Citation.]' " (*People v. Sloan* (2007) 42 Cal.4th 110, 117 [64 Cal.Rptr.3d 137, 164 P.3d 568], italics omitted, quoting *People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228 [45 Cal.Rptr.3d 353, 137 P.3d 184].)

Defendant concedes that the wrongful discharge of a firearm is not an offense necessarily included in the crime of attempted murder under the

elements test because a person can attempt to murder another without using a firearm. And, we note, considering the accusatory pleadings test, it was not here alleged that defendant attempted the murders by use of a firearm.

But, relying primarily on *People v. Pearson* (1986) 42 Cal.3d 351 [228 Cal.Rptr. 509, 721 P.2d 595] (*Pearson*) and *People v. Cook* (2001) 91 Cal.App.4th 910 [111 Cal.Rptr.2d 204] (*Cook*), defendant argues that one must consider the allegations set forth in the enhancements as part of the accusatory pleading, and then, under the "elements test," the wrongful discharge of a firearm becomes an offense necessarily included in the charge of attempted murder. We disagree.

■ Defendant's argument advances no further than *People v. Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520]. The court there decided to "adhere to the majority view that an allegation of firearm use under section 12022.5 should not be considered in determining [a] lesser included offense." (*Id.* at p. 101; see also *People v. Sloan, supra,* 42 Cal.4th at p. 114 [noting the long-standing rule that enhancements are not considered part of the accusatory pleading for purposes of identifying lesser included offenses].) For the purpose of determining lesser included offenses, there is no reason to treat firearm enhancements alleged under section 12022.53 differently than those alleged pursuant to section 12022.5. The allegations of an enhancement must therefore be ignored in determining necessarily included offenses to a charge of attempted murder. As defendant concedes, absent the enhancement allegations, assault with a firearm is not a lesser included offense of attempted murder.

The cases upon which defendant relies do not support his argument. In *Cook, supra,* 91 Cal.App.4th 910, the Court of Appeal decided that conspiracy to commit assault by means of a firearm was a lesser included offense of conspiracy to commit murder because, given the nature of the overt acts alleged, defendants were in fact charged with conspiracy to commit murder *by means of a firearm.* The alleged overt acts, being part of the accusatory pleading, were properly considered in determining lesser included offenses. As we have seen, the charge of attempted murder here did not allege that the attempt was made with a firearm.

In *Pearson,* the defendant was charged with statutory sodomy and lewd acts with a child. He contended he could not be convicted of both because statutory sodomy necessarily included lewd conduct with a child or, conversely, sodomy was included in the offense of lewd conduct. (*Pearson, supra,* 42 Cal.3d at pp. 354–357.) The Supreme Court rejected both contentions. (*Ibid.*)

Unlike the case before us, the issue in *Pearson* was not whether the court was required to instruct on an uncharged lesser offense, but whether the *language of the pleadings* was such that the crimes that were charged related to each other in a way that prevented a conviction for both under the multiple conviction rule of section 954. Defendant here was not charged with a substantive offense relating to wrongful discharge of a firearm nor is the question here a question of the propriety of multiple convictions, but is instead a question of lesser uncharged offenses. Even though *Pearson* dealt with the concept of lesser included offenses, its holding ultimately teaches us nothing about the issue before us.

We hold that, given the pleadings in this matter, assault with a firearm was not a necessarily included offense of the crime of attempted murder.

In a variation on the theme, defendant also appears to contend that the trial court was required to instruct on the lesser included offense of assault with a firearm because the evidence supported such a finding. If that is his argument, we must disagree.

Certainly the evidence showed defendant assaulted the victims with a firearm. But, as we have found, such an assault is not, in these circumstances, a lesser included offense of attempted murder. Evidence of crimes outside those expressly or impliedly raised by the pleadings does not create a lesser included offense where one does not otherwise exist. The evidence to which defendant refers does not justify a lesser included offense instruction any more than if, during the course of the evidence it became apparent that defendant threw trash on the street, such evidence would require an instruction of a "lesser included" offense of littering. If other offenses are not under the law "included" in the charged offense, mere evidence of those offenses does not give them life as a lesser included offense.

## III

### The Gang Enhancements

Defendant contends the jury's true finding on the allegations that the attempted murders were committed for the benefit of a criminal street gang must be reversed for instructional error and because the proof was insufficient to establish that defendant was a member of the criminal street gang known as the Crips at the time of the shooting.

"Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a

criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319–320 [109 Cal.Rptr.2d 851, 27 P.3d 739]; *People v. Gardeley* (1996) 14 Cal.4th 605, 616–617 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People v. Loeun* (1997) 17 Cal.4th 1, 8 [69 Cal.Rptr.2d 776, 947 P.2d 1313].)

"A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period. (§ 186.22, subd. (e); *People v. Gardeley, supra,* 14 Cal.4th at p. 617.) The predicate offenses must have been committed on separate occasions, or by two or more persons (§ 186.22, subd. (e); *People v. Loeun, supra,* 17 Cal.4th at pp. 9–10.) The charged crime may serve as a predicate offense (*People v. Gardeley, supra,* at p. 625; *People v. Olguin* [(1994)] 31 Cal.App.4th [1355,] 1383 [37 Cal.Rptr.2d 596]) . . . ." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457 [119 Cal.Rptr.2d 272].)

Regarding defendant's claim of instructional error, he points out that the jury was told that a "pattern of criminal gang activity" had to be based on the commission or conviction of two or more of the crimes of attempted murder and "battery with serious bodily injury." Defendant correctly points out that the latter is not one of the crimes enumerated in section 186.22, subdivision (b)(1). He concludes therefore that there was instructional error, which error renders the true findings on the criminal street gang enhancement reversible per se. The People do not agree and argue that the error was "harmless under any standard." During oral argument, the People agreed that the proper inquiry is to ask whether the error was harmless beyond a reasonable doubt.

In *People v. Sengpadychith, supra,* 26 Cal.4th 316 (*Sengpadychith*)—a case not cited by either party to this appeal—our Supreme Court found that the trial court erred when it failed to instruct the jury that, in order to find the gang enhancement there alleged true, the jury had to find that the criminal street gang in question had, as one of the gang's primary activities, the commission of one (as the statute then read) or more of the statutorily enumerated felonies. Analyzing the question of the standard for harmless error in light of the United States Supreme Court's holding in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], the high

court held that the harmless error standard that governed depended on "whether the enhancement provision increases the maximum possible penalty for the underlying crime." (*Sengpadychith, supra,* at p. 324.) If it does and if the enhancement is not based on a defendant's prior conviction, the instructional error requires that the gang enhancement finding be reversed unless the error is shown to be harmless beyond a reasonable doubt. (*Sengpadychith, supra,* at p. 324.)

In this matter, the gang enhancement findings increased the penalty for the attempted murder of W.V. by 10 years and the penalty for the attempted murders of S.P. and R.S. by three years four months each. An incorrect instruction as to those offenses that qualify as predicate offenses under section 186.22, subdivision (b)(1) is, for purposes of this discussion, an error equal to a failure to instruct on an element of the enhancement, and thus we must determine whether that error was harmless beyond a reasonable doubt. We find that to be the case here.

██ The charged offense or offenses, in this case attempted murder, may be considered in determining a pattern of criminal street gang activity. (See *People v. Gardeley, supra,* 14 Cal.4th at pp. 624–625 and cases cited therein; *People v. Duran, supra,* 97 Cal.App.4th at p. 1457.) As noted, the jury was so instructed.

Defendant does not dispute that evidence of the attempted murder conviction of Arthur Johnson was sufficient to constitute one of the predicate offenses. The second predicate offense is the conviction of defendant for attempted murder in this matter. Johnson's crime and defendant's crimes were crimes committed on separate occasions by separate persons, thus more than satisfying the requirement that the crimes be committed on separate occasions *or* by two or more persons on a single occasion. And the jury was fully and correctly instructed on the elements of the crime of attempted murder.

The first predicate offense involving the conviction of Arthur Johnson was uncontested and there is no question the jury found the commission of that offense true beyond a reasonable doubt. The jurors had no room to do otherwise. And the jury necessarily found a second predicate offense, the commission of these attempted murders, true beyond a reasonable doubt by virtue of the jury's conviction of defendant for those underlying crimes. We are able to hold therefore that the trial court's instructional error was harmless beyond a reasonable doubt.

It is of no moment that the prosecutor did not choose to argue that the second predicate crime could be established by a conviction of the crimes

alleged in this information. However the prosecutor chose to argue the matter, the jury knew that it could consider the current offenses as a predicate offense under the statute.

 Finally, there was no requirement for a unanimity instruction because commission of the predicate crimes falls within the "continuous-course-of-conduct" exception to the rule requiring unanimity. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1525–1529 [28 Cal.Rptr.2d 758].) The evidence and instructions were sufficient to establish the two predicate crimes. No more was required.

 Defendant's last contention on the subject of the gang enhancement is that the evidence was insufficient to establish that defendant was, at the time of his crime, a member of the Crips. We think there was sufficient evidence—Detective Luke testified defendant was validated as a member of the Crips in 1991, there was no evidence he disassociated himself from the Crips thereafter, and, significantly, defendant said to W.V. just before the shooting, "I'm a Crip, cuz"—but, in any event, section 186.22 does not require that the defendant be an active or current member of the criminal street gang that benefits from his crime. (*In re Ramon T.* (1997) 57 Cal.App.4th 201, 207 [66 Cal.Rptr.2d 816].)

We find no reversible error as to the gang enhancements.

## IV

### Section 654

Defendant's last contention is that it was error for the trial court to sentence him to multiple enhancements under section 186.22. He asserts that adding the criminal street gang enhancement on count two and count three (the attempted murders of S.P. and R.S.) violates the provisions of section 654, which bars multiple punishment for a single criminal act or omission. Again, we must reject his contention.

Section 654, subdivision (a) says in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

 In *People v. Oates* (2004) 32 Cal.4th 1048 [12 Cal.Rptr.3d 325, 88 P.3d 56], our Supreme Court considered whether section 654 barred multiple enhancements under section 12022.53 when the defendant and his

companion fired two shots at a group of five people, but hit only one of them. The court concluded that section 654 did not preclude multiple enhancements because section 654 does not overcome the judicially created exception to section 654, which exception allows for such multiple punishment in cases where there are multiple victims.

"We have long held that 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' [Citation.] As we have explained: 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. . . . This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not "applicable where . . . one act has two results, each of which is an act of violence against the person of a separate individual." [Citations.]' [Citation.] Attempted premeditated murder qualifies as a crime of violence for purposes of applying this 'multiple victim' exception." (*People v. Oates, supra*, 32 Cal.4th at p. 1063.)

In this matter, defendant attempted to murder three people and his culpability is greater than if he had attempted to murder only one. Sentencing him to the term prescribed by law for each attempted murder and adding the punishment provided for by appropriate enhancements of each crime comports with common sense. Defendant attempted to murder W.V. Adding to the seriousness of that offense, he used a firearm, the use of which resulted in great bodily injury. Adding further to the seriousness of that offense, defendant committed the crime on behalf of or in association with a criminal street gang. Defendant attempted to murder S.P. and R.S. Adding to the seriousness of those crimes, he used a firearm, which, as to S.P., resulted in great bodily injury. Adding further to the seriousness of those offenses, defendant committed the crime on behalf of or in association with a criminal street gang. Punishing defendant in this manner appropriately addresses the degree of his culpability for committing three separate offenses made more serious by the method by which they were carried out and by the reason for which they were committed.

Defendant's argument, as we understand it, is that, whatever criminal act he committed on March 27, 2005, he committed on behalf of the Crips and he should be punished under section 186.22 only once. His argument attempts to avoid the fact that he committed three separate attempts to commit murder, each on behalf of a criminal street gang. Multiple enhancements were therefore appropriate.

DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Cantil-Sakauye, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 9, 2008, S163704.